**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**KVAR ENERGY SAVINGS, INC.,**

**Plaintiff,**

**-vs-**                                                      **Case No.  6:08-cv-85-Orl-19KRS**

**TRI-STATE ENERGY SOLUTIONS, LLP,**
**CHIEFFO ELECTRIC, INC.,**
**LAWRENCE GILLEN,**
**JOSEPH J. CHEIFFO,**

**Defendants.**
_____

# ORDER

This case comes before the Court on the following:

1.      Motion to Dismiss for Lack of Personal Jurisdiction and Alternative Motion to

        Transfer Venue by Defendants Tri-State Energy Solutions, LLP, Chieffo Electric,

        Inc., Lawrence Gillen, and Joseph J. Chieffo (Doc. No. 22, filed Mar. 21, 2008);

2.      Notice of Filing the Declaration of Joseph Chieffo by Defendants (Doc. No. 26, filed

        Mar. 24, 2008);

3.      Notice of Filing the Declaration of Lawrence Gillen by Defendants (Doc. No. 27,

        filed Mar. 24, 2008); and

4.      Response to Defendants' Motion to Dismiss for Lack of Personal Jurisdiction and

        Alternative Motion to Transfer Venue and Accompanying Documents by Plaintiff

        KVAR Energy Savings, Inc. (Doc. No. 58, filed Aug. 18, 2008).

**Background**

I.      **Undisputed Facts**

Lawrence Gillen is a Delaware resident who first learned of KVAR Energy Savings, Inc.,

a Florida corporation, while browsing the Internet in December of 2005.  (Doc. No. 27 at 3, ¶¶ 2-3.)

Gillen was looking for energy saving devices to use in his wife's store in Middletown, Delaware.

(*Id.* ¶ 3.)  He discovered KVAR online and contacted the company in Florida about purchasing its

products.  (*Id.* at 4, ¶ 4; Doc. No. 58-2 at 2, ¶ 3.)  Gillen learned that KVAR did not normally sell

its products on a retail basis to end-users.  (Doc. No. 27 at 4, ¶ 4.)  Nevertheless, KVAR agreed to

sell Gillen two units and shipped them from Florida to Delaware.  (*Id.* ¶ 5; Doc. No. 58-2 at 2, ¶ 3.)

To receive these units, however, KVAR required Gillen to sign a confidentiality and non-disclosure

agreement.  (Doc. No. 27 at 4, ¶ 5; Doc. No. 58-2 at 2, ¶ 4.)   KVAR faxed the agreement to

Delaware where Gillen signed it.  (Doc. No. 27 at 4, ¶ 5.)

After the KVAR units were installed in his wife's store, Gillen again contacted KVAR in

Florida to ask about the possibility of becoming a distributor of KVAR products in Delaware.  (*Id.*

¶ 7; Doc. No. 58-2 at 2, ¶ 5.)   Gillen spoke with the president of KVAR, Gregory Taylor, who

expressed concern about Gillen's proposal because Gillen was not a trained electrician.  (Doc. No.

27 at 4, ¶ 8; Doc. No. 58-2 at 2, ¶ 6.)  In response, Gillen contacted a friend, Joseph Chieffo, who

had approximately twenty years of experience as an electrical contractor.  (Doc. No. 26 at 4, ¶ 3;

Doc. No. 27 at 4, ¶ 8; Doc. No. 58-2 at 2-3, ¶ 6.)  Chieffo was the president of Chieffo Electric, Inc.

which is a Delaware-based electrical contracting company that only does business in Delaware and

the surrounding area.  (Doc. No. 26 at 3, ¶ 2.)  Gillen and Chieffo, as co-presidents, formed Tri-State

Energy Solutions, LLP for the purpose of distributing electrical products in approximately March

of 2006.  (Doc. No. 26 at 4, ¶ 3; Doc. No. 27 at 5, ¶ 9.)  When Gillen next contacted Taylor, Taylor agreed to discuss granting Tri-State the right to distribute KVAR products.  (Doc. No. 27 at 5, ¶ 10; Doc. No. 58-2 at 2-3, ¶ 6.)

Gillen and Chieffo traveled to Florida on March 16, 2006 to discuss their business plan with Taylor and remained there for two days.  (Doc. No. 26 at 4, ¶ 4; Doc. No. 27 at 5, ¶ 11; Doc. No. 58-2 at 3, ¶ 7.)  Taylor was told that Chieffo Electric would be involved with Tri-State in the distribution and installation of KVAR products.  (Doc. No. 58-2 at 3, ¶ 7.)  Early in the discussions, Chieffo signed a confidentiality and non-disclosure agreement identical to the one previously signed by Gillen.  (*Id.* ¶ 8.)

The negotiations in Florida were successful, and Gillen, Chieffo, and Taylor entered into an agreement which granted Tri-State the exclusive right to distribute KVAR products in Delaware.  (Doc. No. 26 at 4, ¶ 4; Doc. No. 27 at 5, ¶ 11; Doc. No. 58-2 at 3, ¶ 9.)  This agreement was executed and notarized in Florida.  (Doc. No. 58-2 at 3, ¶ 9.)  Gillen and Chieffo then returned to Delaware, and Tri-State began marketing and selling KVAR products there.  (Doc. No. 26 at 4, ¶ 5; Doc. No. 27 at 5, ¶ 12.)

About two months later, in May of 2006, KVAR agreed to an expansion of Tri-State's exclusive distribution territory to include Maryland and Pennsylvania.  (Doc. No. 26 at 4, ¶ 6; Doc. No. 27 at 5, ¶ 13; Doc. No. 58-2 at 4, ¶ 11.)  To reflect this expansion, a second exclusive distribution agreement, effective May 3, 2006, was executed[1] by KVAR in Florida and by Tri-State

---

[1] The parties disagree on when and where they agreed on the distribution expansion.  Taylor contends that the agreement was reached after Tri-State telephoned KVAR in Florida and negotiated the expansion.  (Doc. No. 58-2 at 4, ¶ 11.)  Gillen and Chieffo assert that the agreement was instead reached while Taylor was in Delaware observing Tri-State's operations.  (Doc. No. 26 at 4, ¶ 6; Doc.
(continued...)

in Delaware.  (Doc. No. 26 at 4-5, ¶ 6; Doc. No. 27 at 5, ¶ 13; Doc. No. 58-2 at 4, ¶ 11.)  Also around this time, Taylor traveled to Delaware to observe Tri-State's operations.  (Doc. No. 26 at 4, ¶ 6; Doc. No. 27 at 5, ¶ 13.)

The distribution relationship between Tri-State and KVAR continued without major problems until approximately September of 2007.  (Doc. No. 58 at 6.)  At that time, as alleged by KVAR, "Tri-State began purchasing genuine KVAR™ branded products, removing the KVAR™ trademarks, and re-labeling and reselling these genuine KVAR™ products as Tri-State's own brand, 'Kilowatt Nanny.'"  (*Id.* at 8-9.)

## II.    Procedural History

Plaintiff KVAR Energy Savings, Inc. brought this action on January 18, 2008 against Defendants Tri-State Energy Solutions, LLP, Chieffo Electric, Inc., Lawrence Gillen, and Joseph J. Chieffo, alleging nine counts: (1) trademark infringement in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (2006), (2) certification mark infringement in violation of Section 43(a) of the Lanham Act, (3) false advertising and unfair competition in violation of Section 43(a) of the Lanham Act, (4) misappropriation of confidential information, (5) trade libel, (6) breach of contract, (7) breach of the implied covenant of good faith and fair dealing, (8) intentional interference with contract, prospective economic advantage, and advantageous business relationships, and (9) violation of Florida's Deceptive and Unfair Trade Practices Act, §§ 501.201-501.213 (2007).  (Doc. No. 1.)  In response, Defendants jointly filed a Motion under Federal Rule of Civil Procedure 12(b)(2) to dismiss for lack of personal jurisdiction or, in the alternative, to

---

[1] (...continued)
No. 27 at 5, ¶ 13.)

transfer the case to the District Court of Delaware.  (Doc. No. 22.)  Plaintiff opposes this Motion. (Doc. No. 58.)

**Analysis**

**I.      Motion to Dismiss**

      **A.      Standard of Review**

When a defendant brings a motion to dismiss under Federal Rule of Civil Procedure 12(b)(2), the plaintiff bears the burden of establishing a *prima facie* case of personal jurisdiction. *Stubbs v. Wyndham Nassau Resort & Crystal Palace Casino*, 447 F.3d 1357, 1360 (11th Cir. 2006) (citing *Meier ex rel. Meier v. Sun Int'l Hotels, Ltd.*, 288 F.3d 1264, 1268-69 (11th Cir. 2002)).  "A *prima facie* case is established if the plaintiff presents enough evidence to withstand a motion for directed verdict." *Id.* (quoting *Meier*, 288 F.3d at 1269 (citations and internal quotations omitted)).  A court must accept the facts alleged in the complaint as true, to the extent they are uncontroverted by the defendant's affidavits. *Id.*  When the defendant "submits affidavits contrary to the allegations in the complaint, the burden shifts back to the plaintiff to produce evidence supporting personal jurisdiction, unless the defendant's affidavits contain only conclusory assertions that the defendant is not subject to jurisdiction." *Id.*  Where conflicts exist between the various affidavits, a court must construe all reasonable inferences in favor of the plaintiff. *Id.*

      **B.      General Principles of Law Concerning Personal Jurisdiction**

Under the Federal Rules of Civil Procedure, serving a summons or filing a waiver of service establishes personal jurisdiction over a defendant:

      (A)     who is subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located;

(B)      who is a party joined under Rule 14 or 19 and is served within a judicial district of the United States and not more than 100 miles from where the summons was issued; or

(C)      when authorized by a federal statute.

Fed. R. Civ. P. 4(k)(1).

In the instant case, both parties correctly recognize that Rule 4(k)(1)(A) delineates the applicable legal standard.[2]  (*See* Doc. No. 22 at 6-7; Doc. No. 58 at 10-11, 15.)  A federal district court considering the applicability of Rule 4(k)(1)(A) must conduct a two-step inquiry to determine whether personal jurisdiction would exist in a court of general jurisdiction in the state where the district court is located. *Mut. Serv. Ins. Co. v. Frit Indus., Inc.*, 358 F.3d 1312, 1319 (11th Cir 2004). First, the court must "determine whether the exercise of jurisdiction is appropriate under the forum state's long-arm statute." *Id.* (citing *Sculptchair, Inc. v. Century Arts, Ltd.*, 94 F.3d 623, 626 (11th Cir. 1996)).  Second, the court must "examine whether the exercise of personal jurisdiction over the defendant would violate the Due Process Clause of the Fourteenth Amendment[3] to the United States Constitution . . . ." *Id.*  The Fourteenth Amendment "requires that the defendant have minimum

---

[2]  The other two provisions of Rule (k)(1) do not appear to apply.  Nothing in the record suggests that Defendants were served within "100 miles from where the summons was issued" or were subject to interpleader; therefore, Rule 4(k)(1)(B) is inapplicable.  Rule 4(k)(1)(C) is likewise inapplicable because the only federal statute that Plaintiff claims Defendants violated is the Lanham Act, (Doc. No. 1 at 14-24), which is silent as to service of process and personal jurisdiction. *E.g.*, *Capitol Fed. Sav. Bank v. E. Bank Corp.*, 493 F. Supp. 2d 1150, 1158 (D. Kan. 2007); *Vax-D Med. Techs., LLC v. Allied Health Mgmt., Ltd.*, No. 8:04-cv-1617-T-26, 2006 WL 680659, at *1 (M.D. Fla. Mar.14, 2006).   Neither party has argued that Rule 4(k)(2) applies to the instant case.  This Rule is applicable only when no one state has sufficient contact with a defendant to satisfy due process. Fed. R. Civ. P. 4(k)(2).  Because Defendants are all American citizens, there is no question that at least one state has sufficient contacts to satisfy due process; the question is whether Florida is one of those states.

[3]  Because Federal Rule of Civil Procedure 4(k)(1)(A) directs a district court to consider whether the forum's *state* court would have jurisdiction, the district court conducts the constitutional analysis under the Fourteenth Amendment rather than the Fifth Amendment.

contacts with the forum state and that the exercise of jurisdiction over the defendant does not offend 'traditional notions of fair play and substantial justice.'" *Id.* (quoting *Sculptchair, Inc.*, 94 F.3d at 626). A court must conduct this inquiry as to each defendant separately, and for specific jurisdiction analysis, as to each claim separately. *Stubbs*, 447 F.3d at 1360 (explaining that a court should "review personal jurisdiction as it relates to each defendant separately"); *Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 274-75 (5th Cir. 2006) ("A plaintiff bringing multiple claims that arise out of different forum contacts of the defendant must establish specific jurisdiction for each claim."); *see also Joseph v. Chanin*, 869 So.2d 738, 740-41 (Fla. 4th DCA 2004) (affirming decision of trial court that treated personal jurisdiction as a claim-by-claim inquiry).

### C.    Florida's Long-Arm Statute

The first step requires the Court to consider whether Florida's long-arm statute, § 48.193, Florida Statutes (2007), grants jurisdiction over Defendants. *Sloss Indus. Corp. v. Eurisol*, 488 F.3d 922, 925 (11th Cir. 2007). This statute describes two types of personal jurisdiction: general jurisdiction and specific jurisdiction. § 48.193(1)-(2), Fla. Stat.; *Christus St. Joseph's Health Sys. v. Witt Biomedical Corp.*, 805 So.2d 1050, 1052 (Fla. 5th DCA 2002). KVAR argues that the Court has personal jurisdiction over Defendants under either standard (Doc. No. 58 at 11-23), and Defendants counter that neither type of jurisdiction applies (Doc. No. 22 at 10-22).

### 1.    General Personal Jurisdiction

#### a.    The Law

KVAR contends that the Court has general personal jurisdiction over all Defendants in this case. (*E.g.*, Doc. No. 58 at 11.) Under Florida's long-arm statute, general jurisdiction is conferred as follows:

> A defendant who is engaged in substantial and not isolated activity within this state, whether such activity is wholly interstate, intrastate, or otherwise, is subject to the jurisdiction of the courts of this state, whether or not the claim arises from that activity.

*Id.* § 48.193(2). "Substantial and not isolated activity" means that the "necessary minimum contacts between the [defendant] and the state, for the assertion of general jurisdiction, must be 'continuous and systematic.'" *Abramson v. Walt Disney Co.*, 132 F. App'x 273, 275 (11th Cir. 2005) (citation omitted); *accord Carib-USA Ship Lines Bahamas Ltd. v. Dorsett*, 935 So.2d 1272, 1275 (Fla. 4th DCA 2006); *Bafitis v. Ara*, 815 So.2d 702, 703 (Fla 3d DCA 2002) (citing cases). In making a determination as to general jurisdiction, a court should consider a defendant's contacts collectively over the relevant "period of years prior to the filing of a complaint." *Mold-Ex, Inc. v. Mich. Tech. Representatives*, No. 3:04-cv-307-MCR(MD), 2005 WL 2416824, at *5 (N.D. Fla. Sept. 30, 2005); *Autonation, Inc. v. Whitlock*, 276 F. Supp. 2d 1258, 1263 (S.D. Fla. 2003); *Woods v. Nova Cos. Belize Ltd.*, 739 So.2d 617, 621 (Fla. 4th DCA 1999). Such contacts must be "so substantial and of such a nature as to justify suit against [the defendant] on causes of action arising from dealings entirely distinct from those activities." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 318 (1945) (citations omitted). The required showing is "more stringent" and "more rigorous" than that which is required for specific jurisdiction. *Meier*, 288 F.3d at 1274; *Christus St. Joseph's Health Sys.*, 805 So.2d at 1052.

If a court has general personal jurisdiction over a defendant, the plaintiff's claims need not arise out of the defendant's contacts with the forum state. *Meier*, 288 F.3d at 1271 n.9; *Woods*, 739 So.2d at 620. Furthermore, "[i]f the burden is met under Florida's general jurisdiction statute, the constitutional due process burden is necessarily also met." *Dorsett*, 935 So. 2d at 1275-76 (citation omitted); *accord Meier*, 288 F.3d at 1269 n.6; *Mold-Ex, Inc.*, 2005 WL 2416824, at *5. This is

because, "in construing Section 48.193(2), Florida courts have harmonized this language with the constitutional due process requirements set forth in *Helicopteros Nacionales de Columbia, S.A. v. Hall*, 466 U.S. 408 (1984)." *Travel Opportunities of Ft. Lauderdale, Inc. v. Walter Karl List Mgmt., Inc.*, 726 So.2d 313, 314 (Fla. 4th DCA 1999) (citation and quotation marks omitted).

Courts interpreting Section 48.193(2), Florida Statutes, have found that general personal jurisdiction exists over a foreign corporation when a local Florida corporation acts as the foreign corporation's agent, *Meier*, 288 F.3d at 1272-74; *Universal Caribbean Establishment v. Bard*, 543 So.2d 447, 448 (Fla. 4th DCA 1989), over a foreign citizen who previously had a three-year distribution relationship with a Florida wholesaler, *Achievers Unlimited, Inc. v. Nutri Herb, Inc.*, 710 So.2d 716, 720 (Fla. 4th DCA 1998), and over a former manager of a dealership owned by a Florida corporation who maintained regular business contacts with the Florida corporation, *Whitlock*, 276 F. Supp. 2d at 1263; *AutoNation, Inc. v. Hankins*, No. 03-14544 CACE (05), 2003 WL 22852206, at *5-6 (Fla. 17th Cir. Ct. Nov. 24, 2003). On the other hand, courts have declined to find general personal jurisdiction over a foreign corporation whose employees briefly trained in the state, whose representatives visited the state only for purchases and related trips, and whose chief executive officer visited the state once for a contract negotiation session, *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 416-18 (1984), and over a foreign corporation whose only contacts with the forum were the regular purchases of goods in that forum, *Rosenberg Bros. & Co. v. Curtis Brown Co.*, 260 U.S. 516, 518 (1923).

With this legal background in mind, the Court considers whether it has general personal jurisdiction over Tri-State, Chieffo Electronic, Gillen, and Chieffo.

b.        **Tri-State Energy Solutions, LLP**

KVAR has provided the following evidence of Tri-State's contacts with Florida.  From March of 2006 to approximately September of 2007, Tri-State and KVAR had a working distribution relationship.  During this time, Gillen and Chieffo, on behalf of Tri-State, would telephone KVAR's office in Florida frequently,[4] and at times daily.  (Doc. No. 58-3 at 2, ¶ 3.)  Tri-State would contact KVAR concerning such matters as ordering, shipping, and paying for KVAR units, repairing and replacing KVAR units, alerting KVAR to possible distributors in Tri-State's territory, and promoting KVAR products.  (*Id.* at 2-3, ¶¶, 3, 7-9.)  On occasion, a representative from Tri-State would telephone KVAR to inform KVAR of advertisements that Tri-State had placed in Delaware, Maryland, and Pennsylvania.  (*Id.* at 4, ¶ 11.)

KVAR mailed from its Florida offices to Tri-State confidential proprietary information, sales support items such as brochures, warranty information, and selections from electric code regulations, as well as advertising support materials such as copies of pictures of KVAR units, KVAR logos, and customer testimonials.  (*Id.* at 3, ¶¶ 7-8.)  When a KVAR unit that Tri-State received needed to be repaired or replaced, Tri-State would mail the unit back to KVAR's office in Florida.  (*Id.*)  KVAR would then ship the repaired unit or a replacement unit back to Tri-State for installation and distribution.  (*Id.*)

---

[4] Attached to the Declaration of Mark H. Anania is a Federal Rule of Evidence 1006 summary of "Defendants' telephone, facsimile, and other correspondence with Plaintiff and other individuals or entities located in the State of Florida."  (Doc. No. 58-4 at 2, ¶ 3.)  This summary purports to demonstrate approximately 573 "contacts" that Defendants had with Florida from February 10, 2006 to September 20, 2007.  (*Id.* at 4-21.)  Of those, approximately 285 are telephone calls from Gillen's cell phone to KVAR, and approximately 26 are calls from Chieffo's cell phone to KVAR.  (*Id.*)

Tri-State placed its orders with KVAR in Florida via telephone or facsimile.  (*Id.* at 2, ¶ 4.) Tri-State would often follow up with KVAR about the status of its orders and would occasionally call to request that an order be expedited.  (*Id.*)  KVAR's products were shipped to Tri-State F.O.B. from KVAR's offices in Florida.  (*Id.* ¶ 5.)  Tri-State paid for its orders by using a credit card and ordered over $200,000.00 worth of KVAR units.  (*Id.* at 2-3, ¶¶ 5-6.)

The May 3, 2006 Regional Distributor Agreement between Tri-State and KVAR contemplated at least a one-year duration, (Doc. No. 1-2 at 4, ¶ 15), required Tri-State to seek KVAR's advance approval for any advertising, promoting, or marketing materials that it independently created, (*id.* at 3, ¶ 10), required Tri-State to seek the written permission from KVAR for any modification of KVAR products (*id.* at 4, ¶ 14), and included a provision designating the governing law of the agreement as "the laws of the State of Florida," (*id.* at 7, ¶ 24).

Because Tri-State initiated contact with KVAR in Florida, received confidential proprietary information from KVAR, distributed KVAR products for over a year, regularly made contact with KVAR representatives in Florida, and through its officers demonstrated an intent to maintain a long-term distributor relationship with KVAR, the Court finds that Tri-State engaged in substantial and not isolated activity in Florida.  *See, e.g.*, *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473 (1985) ("And with respect to interstate contractual obligations, we have emphasized that parties who 'reach out beyond one state and create continuing relationships and obligations with citizens of another state' are subject to regulation and sanctions in the other State for the consequences of their activities."); *Whitlock*, 276 F. Supp. 2d at 1263 (general personal jurisdiction over a defendant who ran an out-of-state dealership for a Florida corporation, previously had worked for six months in Florida, attended six meetings in Florida, communicated regularly with the corporation, and

transmitted business information to and from Florida); *Hankins*, 2003 WL 22852206, at \*5-6 (finding general personal jurisdiction over a foreign citizen who "received regular and frequent supervision, direction and control" and "proprietary and confidential business information" from his Florida employer); *Achievers Unlimited, Inc.*, 710 So.2d at 720 (general personal jurisdiction over a defendant who had a three-year distribution relationship with a Florida Corporation); *Nordmark Presentations, Inc. v. Harman*, 557 So.2d 649, 651 (Fla. 2d DCA 1990) (suggesting general personal jurisdiction exists over a foreign citizen who had "continuing obligations and contact" with his Florida employer who provided "specific and direct supervision" of the defendant's work over a two-year period).   Therefore, the Court has general personal jurisdiction over Tri-State under Florida's long-arm statute.   Because Section 48.193(2) is coextensive with the Fourteenth Amendment's due process requirements, the Court's exercise of jurisdiction over this Defendant necessarily comports with due process.

### c.    Chieffo Electric, Inc.

KVAR offers the following facts to demonstrate Chieffo Electric's contacts with Florida. First, in his declaration, KVAR President Gregory Taylor contends that Gillen and Chieffo informed him during their March of 2006 meeting in Florida that "Chieffo Electric would be involved in the distribution and installation of KVAR products."  (Doc. No. 58-2 at 3, ¶ 7.)  In addition, Chieffo would occasionally fax orders to KVAR on behalf of Tri-State using Chieffo Electric letterhead. (*Id.* at 2, ¶ 4; Doc. No. 58-4 at 38-39.)  Finally, KVAR has provided a webpage from the Chieffo Electric website which is entitled "KVAR Units: Chieffo Electric, Inc." and states that Chieffo Electric is a distributor of the "Kilowatt Nanny" via "our partner company Tri-State Energy Solutions."  (Doc. No. 58-4 at 23.)

KVAR contends, "Under Florida law, a nonresident partner can be subject to personal jurisdiction in Florida where the partnership has conducted business." (Doc. No. 58 at 15 (citing *Kelly v. Fla. Dep't of Ins.*, 597 So.2d 900, 902 (Fla. 3d DCA 1992)).)  From this premise, KVAR concludes, "Tri-State's substantial business activities in Florida . . . support the exercise of personal jurisdiction over its 'partner company,' Chieffo Electric." (*Id.*)

In *Kelly*, Florida's Third District Court of Appeal stated, "It is well established law that partners, acting within their authority and in pursuit of partnership business, bind all other partners and act as their agents." *Kelly*, 597 So.2d at 902 (citing cases).  The court continued, "It is equally well established that each general partner is personally liable for all partnership obligations." *Id.* Therefore, concluded the court, when nonresident partners conduct business in Florida through their co-partners, knowing that they are personally liable for all partnership debts, these nonresident partners "should have reasonably expected to be haled into court in Florida." *Id.*

In the instant case, KVAR emphasizes the fact that Chieffo faxed orders to KVAR on Chieffo Electric letterhead (Doc. No. 58-4 at 38-39); however, KVAR has not provided any evidence that Chieffo was placing these orders on behalf of Chieffo Electric rather than Tri-State. KVAR also provides the webpage from Chieffo Electric's website to prove that Chieffo Electric and Tri-State have formed a partnership. (*Id.* at 23.)  It is not reasonable to infer solely from this online advertisement, however, that the two corporations have entered into a formal partnership agreement. KVAR has not provided evidence that Chieffo Electric has assumed liability for Tri-State's debts or in any way operated as a *de facto* partnership with Tri-State.  In contrast, Chieffo stated in his sworn declaration, "Chieffo Electric, Inc. does not have an interest in Tri-State, and does not hold any office in Tri-State." (Doc. No. 26 at 4, ¶ 3.)

The evidence before the Court shows that Chieffo Electric has never done business in Florida and is not a party to any contract presented in this case. (*Id.* at 3-4, ¶¶ 2-3.) In fact, the record fails to reveal *any* contacts that Chieffo Electric has had with Florida. Thus, KVAR has failed to make a *prima facie* showing that Chieffo Electric engaged in substantial and not isolated activity in Florida. KVAR has not, therefore, demonstrated that the Court has general personal jurisdiction over this Defendant.

### d.   Lawrence Gillen

The evidence demonstrates that Lawrence Gillen contacted KVAR in Florida after he found the company on the Internet. (Doc. No. 27 at 3-4, ¶¶ 2-4.) He first sought to purchase KVAR products for his wife's store and signed a confidentiality and non-disclosure agreement when making this initial purchase. (*Id.*; Doc. No. 1-3.) This agreement stated that Florida law governed, and jurisdiction and venue for any suit arising out of the agreement would "rest solely with the federal or state court having jurisdiction over Volusia County, Florida." (Doc. No. 1-3 at 3, ¶ 9.) After receiving and installing the KVAR products, Gillen again contacted KVAR in Florida and asked about the possibility of becoming a distributor of its products in Delaware. (*Id.* ¶ 7; Doc. No. 58-2 at 2, ¶ 5.) He then traveled to Florida and executed an agreement on behalf of Tri-State to distribute KVAR products in Delaware. (Doc. No. 26 at 4, ¶ 4; Doc. No. 27 at 5, ¶ 11; Doc. No. 58-2 at 3, ¶ 9.) During the course of Tri-State's distribution relationship with KVAR, Gillen telephoned KVAR on a regular basis. (Doc. No. 58-3 at 3, ¶¶ 7-9.) Approximately 285 calls were placed to KVAR from Gillen's cell phone from February of 2006 to September of 2007. (Doc. No. 58-4 at 5-21.)

In response to this evidence, Defendants assert, "Gillen's contacts with the State of Florida, in his individual capacity, are limited to his private purchase of two KVAR units for his wife's

Delaware store." (Doc. No. 22 at 20.) In other words, Gillen's actions on behalf of Tri-State should not be considered to establish personal jurisdiction over Gillen individually. This is known as the corporate shield doctrine[5] which provides that the acts of a corporate employee performed in his or her corporate capacity may not form the basis for jurisdiction over the corporate employee in his or her individual capacity. *Doe v. Thompson*, 620 So.2d 1004, 1006 (Fla. 1993). Thus, Defendants are correct that Gillen's contacts with Florida on behalf of Tri-State may not confer general personal jurisdiction over Gillen individually.

KVAR's evidence shows two types of contacts that Gillen had with Florida that were not related to Tri-State. First, Gillen contacted KVAR in Florida in approximately December of 2005 and ordered products for his wife's store. (Doc. No. 27 at 4, ¶¶ 4-5.) Secondly, between March of 2006 and September of 2007, approximately 26 calls were placed from Gillen's cell phone to unidentified telephone numbers with a Florida area code.[6] (Doc. No. 58-4 at 5-21.) These contacts do not, however, establish the "continuous and systematic contacts" that are necessary to demonstrate "substantial and not isolated activity" under Section 48.193(2). *See, e.g.*, *Helicopteros Nacionales*, 466 U.S. at 417 ("purchases and related trips standing alone are not a sufficient basis for a State's assertion of jurisdiction"); *id.* at 418 ("mere purchases, even if occurring at regular intervals, are not enough to warrant a State's assertion of in personam jurisdiction over a nonresident corporation in a cause of action not related to those purchase transactions"); *Mold-Ex*, 2005 WL

---

[5] There is an exception to this doctrine. It does not apply when an individual corporate officer commits an intentional, tortious act expressly aimed at a person or entity in Florida. *E.g.*, *Thompson*, 620 So.2d at 1006 n.1; *Allerton v. Fla. Dep't of Ins.*, 635 So.2d 36, 39 (Fla. 1st DCA 1994). Because this exception applies only to a tort claim, it will be discussed in the Court's analysis of specific personal jurisdiction in Section I.C.2.b, *infra*.

[6] There is no evidence in the record to show that these telephone numbers corresponded with Florida land lines as opposed to cell phones that could be located anywhere in the country.

2416824, at *4-5 ("[The defendant's] only contact with the State of Florida was its long-term contractual relationship (entered into out of state) with a Florida plaintiff which required it to find buyers for the plaintiff in markets other than Florida and to service those out of state relationships from Michigan.  These contacts are far too attenuated to support a finding of continuous and systematic contacts with the State of Florida under § 48.193(2)."). A single purchase and twenty-six telephone calls over an eighteen month period do not constitute continuous and systematic contacts. Therefore, KVAR has failed to establish that the Court has general personal jurisdiction over Gillen individually.

### e.      Joseph J. Chieffo

Joseph Chieffo is also a resident of Delaware and is co-president of Tri-State and president of Chieffo Electric.  (Doc. No. 26 at 3, ¶ 2.)  Chieffo's only visit to Florida was when he went with Gillen in March of 2006 and executed the first distribution agreement with KVAR on behalf of Tri-State.  (*Id.* at 4, ¶ 4; Doc. No. 27 at 5, ¶ 11; Doc. No. 58-2 at 3, ¶ 9.)  Also while in Florida, Chieffo signed a confidentiality and non-disclosure agreement identical to the one previously signed by Gillen.  (Doc. No. 58-2 at 3, ¶ 8.)  From March of 2006 to September of 2007, calls were placed to KVAR from Chieffo's cell phone approximately 26 times.  (Doc. No. 58-4 at 5-21.)  On a couple of occasions, Chieffo faxed orders to KVAR on behalf of Tri-State using the Chieffo Electric letterhead.  (Doc. No. 58-3 at 2, ¶ 4; Doc. No. 58-4 at 38-39.)

Just as with Gillen, the corporate shield doctrine protects Chieffo from personal jurisdiction in this forum because his relevant conduct was performed as a corporate officer of Tri-State. *Thompson*, 620 So.2d at 1006.  The only other evidence that KVAR has offered is one call made from Chieffo's cell phone to an unknown Florida telephone number and two calls from a Florida

number to his cell.  This evidence fails to establish that Chieffo had continuous and systematic contacts with Florida; therefore, this Court lacks general personal jurisdiction over him.

Having concluded that the Court lacks general personal jurisdiction over Chieffo Electric, Gillen individually, and Chieffo individually, the Court must consider whether it has specific jurisdiction over any of these Defendants.

## 2.       Specific Personal Jurisdiction

KVAR asserts that the Court has specific personal jurisdiction over Defendants under subsections (a), (b), and (g) of § 48.193(1), Florida Statutes.  (Doc. No. 58 at 15-20.)  These provisions of Florida's long-arm statute confer personal jurisdiction as follows:

> Any person, whether or not a citizen or resident of this state, who personally or through an agent does any of the acts enumerated in this subsection thereby submits himself or herself and, if he or she is a natural person, his or her personal representative to the jurisdiction of the courts of this state for any cause of action arising from the doing of any of the following acts:
>
> (a)     Operating, conducting, engaging in, or carrying on a business or business venture in this state or having an office or agency in this state.
>
> (b)     Committing a tortious act within this state.
>
> * * *
>
> (g)     Breaching a contract in this state by failing to perform acts required by the contract to be performed in this state.

*Id.* § 48.193(1)(a)-(b), (g).[7]  As the language of this provision indicates, "specific jurisdiction arises out of a party's activities in the forum that are related to the cause of action alleged in the

---

[7] Unlike the long-arm statutes in many states, as recognized by Florida's Supreme Court, "Conspicuously absent from the long arm statute is any provision for submission to *in personam* jurisdiction merely by contractual agreement."  *McRae v. J.D./M.D., Inc.*, 511 So.2d 540, 543 (Fla. 1987).

complaint." *Christus St. Joseph's Health Sys.*, 805 So.2d at 1052 (citing *Madara v. Hall*, 916 F.2d 1510, 1516 n. 7 (11th Cir. 1990)).  "This has been described as the 'connexity' requirement that must be met before jurisdiction over a nonresident can be sustained." *Bloom v. A.H. Pond Co.*, 519 F. Supp. 1162, 1168 (S.D. Fla. 1981) (citations and footnote omitted).  The Court will consider the applicability of each of these subsections to Chieffo Electric, Gillen individually, and Chieffo individually.

### a.      Conducting Business in Florida

In order to establish that a defendant was carrying on a business or business venture in Florida under Section 48.193(1)(a), the plaintiff must demonstrate that the activities of the defendant, "considered collectively," demonstrate "a general course of business activity in the State for pecuniary benefit." *Sculptchair, Inc.*, 94 F.3d at 627 (quoting *Dinsmore v. Martin Blumenthal Assocs., Inc.*, 314 So.2d 561, 564 (Fla. 1975)).  To determine whether a defendant meets this standard, Florida courts consider several factors such as "the presence and operation of an office in Florida, the possession and maintenance of a license to do business in Florida,  the number of Florida clients served,  and the percentage of overall revenue gleaned from Florida clients . . . ." *Horizon Aggressive Growth, L.P. v. Rothstein-Kass, P.A.*, 421 F.3d 1162, 1167 (11th Cir. 2005) (citations and quotation marks omitted); *see also Int'l Shoe Co.*, 326 U.S. at 319 (explaining that when a defendant "exercises the privilege of conducting activities within a state," it "enjoys the benefits and protection of the laws of that state," which may in turn give rise to obligations within that state).

The business conducted in Florida must be for pecuniary benefit. *E.g.*, *Sculptchair, Inc.*, 94 F.3d at 627.  Thus, purchasing goods in Florida for use in an out-of-state business by a foreign

defendant does not constitute doing business in Florida.  *O'Brien Glass Co. v. Miami Wall Sys., Inc.*, 645 So.2d 142, 144 (Fla. 3d DCA 1994) ("The foregoing facts merely demonstrate that an out of state corporation (O'Brien), which does not conduct its business in Florida, purchased some goods from a corporation (Miami Wall) which does conduct business in Florida.").  Similarly, utilizing the services of a Florida corporation to repair the technology of an out-of-state business does not constitute doing business in Florida.  *Future Tech. Today, Inc. v. OSF Healthcare Sys.*, 218 F.3d 1247, 1249-50 (11th Cir. 2000) ("Defendant's business is running healthcare facilities in the Midwest, not contracting with computer companies in order to obtain remediation services for its computer information systems.  The contract with plaintiff was not for defendant's pecuniary benefit in any direct sense.").

KVAR has not offered any evidence of Defendants conducting business for pecuniary gain in Florida.  Defendants did not market or sell products in Florida, and they have never maintained an office in Florida or owned or leased real property in the State.  (Doc. No. 26 at 5, ¶ 7; Doc. No. 27 at 6, ¶ 14.)  There is no evidence that Chieffo Electric conducted any business whatsoever in Florida.  Gillen and Chieffo's business interactions in Florida were performed on behalf of Tri-State and involved the distribution of KVAR products in Maryland, Delaware, and Pennsylvania.[8]  (Doc. No. 1-2 at 11.)  The evidence provided by KVAR, therefore, does not establish that Chieffo Electric,

---

[8]  This distinguishes the instant case from the case relied upon by KVAR in which a Florida corporate plaintiff collaborated in a joint venture with a Washington corporate defendant to sell "web-based aeronautical cabin file servers."  *Baker Elecs., Inc. v. Pentar Sys., Inc.*, 219 F. Supp. 2d 1260, 1261-63 (M.D. Fla. 2002).  In that case, both parties were involved in the development of products intended for international sales.  *Id.*  Their venture was carried out in Florida just as much as it was carried out in Washington.  *See id.*  In contrast, in the instant case, KVAR is clearly the manufacturer, Tri-State is clearly the distributor, and Tri-State's sales took place in Maryland, Delaware, and Pennsylvania only.

Gillen individually, or Chieffo individually carried on business activity in Florida.  Thus, KVAR has not demonstrated that Section 48.193(1)(a) confers specific personal jurisdiction over these Defendants.

### b.      Committing a Tort in Florida

Specific jurisdiction may be found under Section 48.193(1)(b) when a defendant commits a tortious act in Florida.  In some instances, physical presence of the defendant in Florida is not required.  *Horizon Aggressive Growth, L.P.*, 421 F.3d at 1168 (citing *Wendt v. Horowitz*, 822 So.2d 1252, 1260 (Fla. 2002)).  For instance, a foreign defendant can "commit in Florida" a tortious act "through telephonic, electronic, or written communications into Florida" so long as the cause of action arises from these communications.  *Wendt*, 822 So.2d at 1260.  In addition, the Eleventh Circuit has construed this provision broadly "to apply to defendants committing tortious acts outside the state that cause injury in Florida."  *Posner v. Essex Ins. Co., Ltd.*, 178 F.3d 1209, 1217 (11th Cir. 1999).

KVAR cites Section 48.193(1)(b) as conferring jurisdiction over Defendants for its claims of trademark and certification mark infringement.  (Doc. No. 58 at 18-20.)  To support this argument as it pertains to Chieffo Electric, KVAR has offered a copy of a webpage[9] on Chieffo Electric's website entitled "KVAR Units, Chieffo Electric, Inc." which advertises the "Kilowatt Nanny." (Doc. No. 58-4 at 23.)  KVAR contends that the use of "Kilowatt Nanny" on the website infringes KVAR's trademark.

---

[9]      Notably, the web address for this page incorporates the name "KVAR": http://www.chieffoelectric.com/kvar.html.

The Eleventh Circuit recently issued an opinion with particular relevance to KVAR's argument, *Licciardello v. Lovelady*, 544 F.3d 1280 (11th Cir. 2008). The issue in *Licciardello* was whether a Florida court has personal jurisdiction over a foreign defendant who allegedly infringed the trademark of a Florida citizen on a website created by the defendant in another state. *Id.* at 1282. The Court found jurisdiction under Section 48.193(b) because the alleged injury, trademark infringement, occurred in Florida "by virtue of the website's accessibility in Florida."[10] *Id.* at 1283.

As was the case in *Licciardello*, Chieffo's Electric's website was accessible in Florida. Also like in *Licciardello*, the website displays the alleged trademark infringement. Therefore, pursuant to the Eleventh Circuit's holding, this Court finds specific personal jurisdiction under Section 48.193(1)(b) over KVAR's trademark infringement claim against Chieffo Electric.

Next, the Court must consider whether this provision grants jurisdiction over Gillen and Chieffo individually. A threshold issue in making this determination is whether the corporate shield doctrine permits the Court to consider Gillen and Chieffo's conduct on behalf of Tri-State. KVAR argues that the corporate shield doctrine does not apply to this claim because trademark infringement is an intentional tort. (Doc. No. 58 at 19-20); *Edelstein v. Marlene D'Arcy, Inc.*, 961 So.2d 368, 372 (Fla. 4th DCA 2007) ("the 'corporate shield doctrine' does not apply as the corporate officer himself is alleged to have committed intentional torts expressly aimed at Florida").

---

[10] Of course, the practical implication of this holding is that it appears to create worldwide jurisdiction for injuries arising from a website by virtue of its worldwide accessibility. The Eleventh Circuit tried to minimize this result by saying, "We do not, by our decision today, intend to establish any general rule for personal jurisdiction in the internet context. Our holding, as always, is limited to the facts before us. We hold only that where the internet is used as a vehicle for the deliberate, intentional misappropriation of a specific individual's trademarked name or likeness and that use is aimed at the victim's state of residence, the victim may hale the infringer into that state to obtain redress for the injury. The victim need not travel to the state where the website was created or the infringer resides to obtain relief." *Licciardello*, 544 F.3d at 1288 n.8.

In its Complaint, KVAR alleged:

Defendants' acts have been committed intentionally, maliciously, fraudulently, and willfully for the purposes of deceiving buyers into purchasing products from Tri-State base don the false belief that Tri-State is authorized by KVAR to sell modified KVAR™ Products, including the "Kilowatt Nanny," and with the specific intent to appropriate to Tri-State and to employ for its own benefit the valuable goodwill and business reputation represented by the KVAR™ Mark.

(Doc. No. 1 at 15, ¶ 77.)  Defendants have not submitted affidavits contrary to these allegations. Thus, the Court assumes these facts are true for purposes of its jurisdictional analysis.  *Stubbs*, 447 F.3d at 1360.  Because KVAR has alleged that Gillen and Chieffo intentionally infringed its trademark, the corporate shield doctrine does not apply.  Therefore, the Court may consider Gillen's and Chieffo's alleged actions on behalf of Tri-State to determine whether the Complaint satisfies the requirements of Section 48.193(1)(b) as to these two Defendants.

The federal district courts in Florida that have considered the application of Section 48.193(1)(b) to claims of trademark infringement have held that Florida's long-arm statute is triggered whenever there is an allegation that the trademark of a Florida resident was infringed. *Licciardello*, 544 F.3d at 1283 (citing *Nida Corp. v. Nida*, 118 F. Supp. 2d 1223, 1231 (M.D. Fla. 2000); *JB Oxford Holdings, Inc. v. Net Trade, Inc.*, 76 F. Supp. 2d 1363, 1368 (S.D. Fla. 1999)). Though the Eleventh Circuit has declined to expressly hold that a "trademark injury necessarily occurs where the owner of the mark resides," *id.*, the Court nevertheless appeared to reach this conclusion when it found on the facts before it in *Licciardello* that the trademark injury occurred in Florida, where the owner of the mark resided, *see id.* at 1287-88 (finding that "the unauthorized use of [the Florida plaintiff's] mark, therefore, individually targeted [the plaintiff] in order to misappropriate his name and reputation for commercial gain . . . . [the foreign defendant's]

intentional conduct . . . was calculated to cause injury to [the plaintiff] in Florida").[11]  Therefore, this Court will follow the holdings of the other district courts in Florida and conclude that a trademark injury occurs where the owner of the mark resides.

According to KVAR's allegations, Gillen and Chieffo's marketing and sale of the "Kilowatt Nanny" was a trademark infringement aimed at KVAR, a Florida corporation that runs its business out of Port Orange, Florida.  (Doc. No. 1 at 1, ¶ 1.)  Because KVAR resides in Florida, the trademark injury occurred in Florida.  *Nida Corp.*, 118 F. Supp. 2d at 1231; *JB Oxford Holdings, Inc.*, 76 F. Supp. 2d at 1368.  Because Section 48.193(b) permits jurisdiction over nonresident defendants who commit torts outside of the state that cause injury in the state, *Licciardello*, 544 F.3d at 1283 (citing *Posner*, 178 F.3d at 1216), the Court has specific personal jurisdiction over KVAR's trademark infringement claims against Gillen and Chieffo individually.

### c.      Breaching a Contract in Florida

Specific personal jurisdiction may be established under Section 48.193(1)(g) if a defendant breaches a contract in Florida by failing to perform acts contractually required to be performed in Florida.  *E.g.*, *Pac. Coral Shrimp v. Bryant Fisheries*, 844 F. Supp. 1546, 1548 (S. D. Fla. 1994); *Hartcourt Cos., Inc. v. Hogue*, 817 So.2d 1067, 1070 (Fla. 5th DCA 2002); *Global Satellite Commc'n Co. v. Sudline*, 849 So.2d 466, 468 (Fla. 4th DCA 2003).

The bulk of KVAR's argument under this provision concerns Tri-State's contract with KVAR.  (*See* Doc. No. 58 at 17-18).  KVAR offers no evidence or argument that Section

---

[11]  The only discernable reason in the *Licardello* opinion for finding that the tortious conduct was purposefully aimed at Florida is that the owner of the trademark resided in Florida; therefore, that is where the injury occurred.  It is unclear how the fact that the infringement appeared on a website, which was accessible worldwide and therefore also accessible in Florida, altered this analysis.

48.193(1)(g) confers specific personal jurisdiction over Chieffo Electric, and the record does not support such a finding.  The limited analysis that KVAR devotes to Gillen and Chieffo individually concerns the confidentiality and non-disclosure agreements that they both signed.  (*Id.* at 18.) KVAR asserts:

> Under the terms of the [confidentiality and non-disclosure agreements ("NDAs")], Mr. Gillen and Mr. Chieffo were not to 'use the Confidential Information other than for the purposes of its [sic] business with KVAR."  The NDAs placed no geographical limitations on this duty.  Mr. Gillen and Mr. Chieffo clearly violated this duty by creating, distributing, selling, and installing their knock-off Kilowatt Nanny products.  These breaches also relate to their contacts with Florida and satisfy any 'connexity' requirements.

(*Id.* (citations omitted).)  KVAR asks this Court to equate breaching a duty of non-disclosure that has "no geographical limitations" with the failure "to perform acts required by the contract to be performed" in Florida.  This argument is foreclosed, however, by the statutory language explicitly requiring contractual performance *in Florida.  Travel Opportunities of Ft. Lauderdale, Inc.*, 726 So.2d at 314 ("the contract itself must require performance in Florida").  Thus, the Court declines to find specific personal jurisdiction over Chieffo Electric, Gillen individually, or Chieffo individually under Section 48.193(1)(g).

### D.    Fourteenth Amendment Due Process

Because the Court has found specific personal jurisdiction over KVAR's claims of trademark infringement against Chieffo Electric, Gillen individually, and Chieffo individually, the Court must consider whether the exercise of personal jurisdiction over these Defendants satisfies the requirements of due process.  The Eleventh Circuit summarized the requisite inquiry as follows:

> [W]e must assess whether [the foreign defendant] has purposefully established such constitutionally significant contact with the state of Florida that he could have reasonably anticipated that he might be sued here in connection with those activities. If so, we must consider whether the forum's interest in this dispute and the plaintiff's

> interest in obtaining relief are outweighed by the burden on the defendant of having
> to defend himself in a Florida court.

*Licciardello*, 544 F.3d at 1284.  The Eleventh Circuit explained that, in the case of intentional torts, the due process personal jurisdiction analysis should proceed under the "effects" test established by the United States Supreme Court in *Calder v. Jones*, 465 U.S. 783, 789-90 (1984), rather than the contracts-oriented "minimum contacts" test.  *Licciardello*, 544 F.3d at 1285-86.  The "effects" test provides that due process is satisfied when the plaintiff brings suit in the forum where the "effects" or "brunt of the harm" caused by the defendant's intentional tortious activity was suffered.  *Id.* at 1285-87 (quoting *New Lenox Indus. v. Fenton*, 510 F. Supp. 2d 893, 904 (M.D. Fla. 2007); *Allerton*, 635 So.2d at 40).  Therefore, personal jurisdiction is proper over a defendant who commits an intentional and allegedly tortious act expressly aimed at the plaintiff in the forum state.  *Id.* (citing *Calder*, 465 U.S. at 789-90).

In *Licciardello*, the Eleventh Circuit found that *Calder*'s "effects" test was satisfied in a trademark infringement case and explained:

> In this case, [the foreign defendant] is alleged to have committed an intentional tort against [the Florida plaintiff]–using his trademarked name and his picture on a website accessible in Florida in a manner to imply [the plaintiff's] endorsement of [the defendant] and his products.  The use was not negligent, but intentional.  The purpose was to make money from [the plaintiff's] implied endorsement.  The unauthorized use of [the plaintiff's] mark, therefore, individually targeted [the plaintiff] in order to misappropriate his name and reputation for commercial gain.  These allegations satisfy the *Calder* effects test for personal jurisdiction–the commission of an intentional tort, expressly aimed at a specific individual in the forum whose effects were suffered in the forum.  The Constitution is not offended by the exercise of Florida's long-arm statute to effect personal jurisdiction over [the defendant] because his intentional conduct in his state of residence was calculated to cause injury to [the plaintiff] in Florida. [The defendant] cannot now claim surprise at being haled into court here.

*Id.* at 1287-88 (citation omitted).  The Eleventh Circuit further found that litigation in Florida comported with fair play and substantial justice because the defendant knowingly caused injury in Florida, and "Florida has a very strong interest in affording its residents a forum to obtain relief from intentional misconduct of nonresidents causing injury in Florida."  *Id.* at 1288.

The same reasoning applies to KVAR's trademark infringement claims against Chieffo Electric, Gillen individually, and Chieffo individually.  KVAR alleges intentional conduct purposefully directed at KVAR in Florida.  Assuming the allegations of the Complaint are true, as this Court must, Defendants had fair warning that they may be subject to suit in Florida, and proceedings in the forum against them on KVAR's trade infringement claims comport with fair play and substantial justice.  Thus, due process is satisfied as to this Court's exercise of specific personal jurisdiction over KVAR's claims of trademark infringement against Chieffo Electric, Gillen individually, and Chieffo individually.

In summary, the Court finds that general personal jurisdiction exists over Tri-State.  Specific personal jurisdiction exists over Chieffo Electric, Gillen individually, and Chieffo individually with respect to KVAR's claims of trademark and certification mark infringement.  The Court lacks specific personal jurisdiction over these three Defendants as to the remaining claims.

## II.    Motion to Transfer

Having concluded that personal jurisdiction is lacking KVAR's claims against certain Defendants, the Court considers Defendants' alternative Motion to transfer[12] the instant action to the

------

[12]   A court may consider a motion to transfer even when personal jurisdiction is found lacking over certain defendants.  *Goldlawr, Inc. v. Heiman*, 369 U.S. 463, 465 (1962); *Aguacate Consol. Mines, Inc. of Costa Rica v. Deeprock, Inc.*, 566 F.2d 523, 524 (5th Cir. 1978).

-26-

District Court of Delaware under 28 U.S.C. 1404(a) (2006).  (Doc. No. 22 at 22-26.)  The United

States Code permits transfer as follows:

> For the convenience of parties and witnesses, in the interest of justice, a district court
> may transfer any civil action to any other district or division where it might have
> been brought.

28 U.S.C. § 1404(a).  Factors to consider in determining the propriety of transfer include:

> (1) the convenience of the witnesses; (2) the location of relevant documents and the
> relative ease of access to sources of proof; (3) the convenience of the parties; (4) the
> locus of operative facts; (5) the availability of process to compel the attendance of
> unwilling witnesses; (6) the relative means of the parties; (7) a forum's familiarity
> with the governing law; (8) the weight accorded a plaintiff's choice of forum; and
> (9) trial efficiency and the interests of justice, based on the totality of the
> circumstances.

*Manuel v. Convergys Corp.*, 430 F.3d 1132, 1135 n.1 (11th Cir. 2005).  In addition, as the Eleventh

Circuit has explained, "Where two actions involving overlapping issues and parties are pending in

two federal courts, there is a strong presumption across the federal circuits that favors the forum of

the first-filed suit under the first-filed rule."  *Id.*; *accord Whitlock*, 276 F. Supp. 2d at 1264 (citing

*Supreme Int'l Corp. v. Anheuser-Busch, Inc.*, 972 F. Supp. 604, 606 (S.D. Fla. 1997)).

Currently pending in the United States District Court for the District of Delaware is an action

brought by Tri-State against KVAR concerning the same distribution relationship at issue in the

instant case.  *Tri-State Energy Solutions, LLP v. KVAR Energy Sav., Inc.*, No. 1:08-cv-209-JFF (D.

Del. 2008).[13]  Tri-State originally filed suit against KVAR in the Court of Chancery of the State of

Delaware on November 19, 2007 and brought claims of unfair competition, misappropriation of

testimonials, deceptive trade practices, and breach of contract.  (Del. Doc. No. 1 at 1, ¶ 2, filed Apr.

11, 2008.)  KVAR then removed the case to federal court.  (*Id.* at 1-4.)  The case pending before this

---

[13]  Documents filed in the Delaware case will be cited as "Del. Doc. No."

Court was filed in the Middle District of Florida by KVAR on January 18, 2008.  (Doc. No. 1.)

Therefore, the Delaware action is the first-filed case, which the Delaware District Court recognized

in denying KVAR's motion to dismiss or in the alternative to transfer to this District.  (Del. Doc.

No. 7 at 23-25, filed Dec. 16, 2008, *available at* 2008 WL 5245712, at *9).[14]  Because both actions

involve issues arising from the distribution agreement between Tri-State and KVAR, Tri-State and

KVAR are parties in both actions, and, unlike this Court, the District Court of Delaware has personal

jurisdiction over all parties and all claims, transfer is appropriate under the first-filed rule.

### Conclusion

Based on the foregoing, the Motion to Dismiss for Lack of Personal Jurisdiction and

Alternative Motion to Transfer Venue by Defendants Tri-State Energy Solutions, LLP, Chieffo

Electric, Inc., Lawrence Gillen, and Joseph J. Chieffo (Doc. No. 22, filed Mar. 21, 2008) is

**GRANTED IN PART AND DENIED IN PART**.  The Court **DENIES** the Motion to Dismiss and

**GRANTS** the Alternative Motion to Transfer.  The Clerk of the Court is directed to transfer this

action to the United States District Court for the District of Delaware with a certified copy of this

Order and to close the case file in this Court.

**DONE** and **ORDERED** in Chambers in Orlando, Florida on January 15, 2009.

PATRICIA C. FAWSETT, JUDGE
UNITED STATES DISTRICT COURT

---

[14]  The parties have since filed a joint proposed scheduling order in the Delaware case.  (Del.
Doc. No. 9, filed Jan. 5, 2009.)

Copies furnished to:

Counsel of Record
Clerk of the U.S. District Court for the District of Delaware